**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

JESSICA EDEN, WALTER EMERY, LESLIE EMERY, and ERIN WHITMIRE,

Plaintiffs,

v.

COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT,

JILL HUNSAKER RYAN, in her individual and official capacity as Executive Director of the Colorado Department of Public Health & Environment;

NED CALONGE, in his individual and official capacity as Chief Medical Officer of Colorado Department of Public Health & Environment;

ALLISON KOHNEN, in her individual and official capacity as State Public Health Veterinarian for Colorado Department of Public Health & Environment;

COLORADO DEPARTMENT OF AGRICULTURE, Division of Animal Welfare – Pet Animal Care Facilities Act Program,

NICK FISHER, in his individual and official capacity as Section Chief of the Pet Animal Care Facilities Act Program, a division of the Colorado Department of Agriculture;

MORGAN McCARTY, in her individual and official capacity as Assistant State Veterinarian for the Colorado Department of Agriculture;

MAGGIE BALDWIN, in her individual and official capacity as State Veterinarian for the Colorado Department of Agriculture;

KATHRYN ROMERO, in her individual and official capacity as inspector for Pet Animal Care Facilities Act Program, a division of the Colorado Department of Agriculture,

Defendants.

Case No. ____________________

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### INTRODUCTION

1. This complaint challenges the concerted actions by the Colorado Department of Public Health and Environment (CDPHE) and the Colorado Department of Agriculture's Pet Animal Care Facilities Act division (PACFA) officials to act beyond the bounds of their authority and unconstitutionally seize and euthanize Plaintiffs' privately owned dogs while acting under color of law.

2. This complaint also challenges the concerted actions by those same officials to act beyond the bounds of their authority and unconstitutionally transfer ownership of the property of a business, resulting in an unconstitutional search and seizure in Plaintiff Whitmire's home. In August 2024, CDPHE, acting in concert with PACFA, by and through various county-level personnel, falsified a public health order to justify the warrantless seizure of dogs from adoptive homes.

3. The Emerys' and Eden's dogs were healthy, vaccinated, and legally owned by Plaintiffs. Plaintiff Whitmire's dogs were healthy, vaccinated, and legally owned by the animal rescue, Moms and Mutts of Colorado Rescue (MAMCO). They were seized without judicial warrants and destroyed without due process in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

### JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

5. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

6. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in Colorado and the events giving rise to the claims occurred in this district.

## PARTIES

7. Plaintiff, JESSICA EDEN, is an adult resident of Denver County, Colorado. She was the lawful owner of a dog named Musubi, which was seized and euthanized by Defendants.

8. Plaintiff, WALTER EMERY, is an adult resident of Denver County, Colorado. He lawfully adopted a dog named Sam, which was seized and euthanized by Defendants.

9. Plaintiff, LESLIE EMERY, is an adult resident of Denver County, Colorado and the spouse of Plaintiff Walter Emery. She jointly owned Sam with Walter Emery.

10. Plaintiff, ERIN WHITMIRE, is an adult resident of the City and County of Denver, Colorado. She was a long-time foster caregiver of multiple dogs seized and euthanized by Defendants.

11. Defendant, Colorado Department of Public Health and Environment, is a governmental agency of the State of Colorado, operating throughout the State of Colorado, pursuant to C.R.S. §§ 25-1-100 – 25-59-106.

12. Defendant, JILL HUNSAKER RYAN, is the Executive Director of the Colorado Department of Public Health and Environment (CDPHE). She is sued in her individual and official capacities.

13. Defendant, NED CALONGE, is the Chief Medical Officer for CDPHE. He is sued in his individual and official capacities.

14. Defendant, Colorado Department of Agriculture, Division of Animal Welfare – PACFA is a governmental agency of the State of Colorado, operating throughout the state of Colorado, pursuant to C.R.S. §§ 35-80-101 et seq.

15. Defendant, ALLISON KOHNEN, is the State Public Health Veterinarian for CDPHE. She is sued in her individual and official capacities.

16. Defendant, MORGAN McCARTY, is the Assistant State Veterinarian for Colorado Department of Agriculture (CDA). She is sued in her individual and official capacities.

17. Defendant, MAGGIE BALDWIN, is the State Veterinarian for Colorado Department of Agriculture. She is sued in her individual and official capacities.

18. Defendant, NICK FISHER, is the Section Chief of the PACFA Program, a division of CDA. He is sued in his individual and official capacities.

19. Defendant, KATHRYN ROMERO, is an inspector for PACFA, a division of the CDA. She is sued in her individual and official capacities.

20. Defendants, John and Jane Does 1-10, are as-yet unidentified individuals employed by CDPHE, PACFA, Denver Animal Protection, Foothills Animal Shelter, or Jefferson County Animal Control, or other state or local government employees yet to be identified. They are sued in their individual and official capacities. Plaintiffs will amend this Complaint upon identification of these individuals through discovery.

**BACKGROUND**

21. Moms and Mutts of Colorado Rescue brought 12 littermate puppies into Colorado around early July 2024, herein referred to as the "Celebrity Kids."

22. The Celebrity Kids were part of adoption events that occurred in the Denver-area of Colorado on or around July 20, 2024.

23. On or about July 20, 2024, marked the last time the Celebrity Kids were together.

24. Oliver, one of the Celebrity Kids, was separated from the rest into a smaller group of about three to four dogs on or about July 23, 2024.

25. This separate small group, which included Oliver, did not include the puppies Sam, Musubi, Pilot, Rocket, Phineas or Bellatrix, dogs owned or cared for by Plaintiffs.

26. On or about July 23, 2024, Erin Whitmire took in all but three or four of the Celebrity Kids.

27. Erin Whitmire brought these dogs, which did not include Oliver's small group, to an adoption event on July 27, 2024.

28. Walter and Leslie Emery paid for and legally adopted a dog named Sam from MAMCO on July 27, 2024, and possessed legal documentation of ownership.

29. Jessica Eden paid for and legally adopted a dog named Musubi from MAMCO on July 27, 2024, and possessed legal documentation of ownership.

30. Shortly thereafter, Oliver developed signs of illness.

31. On or around August 2, 2024, it was suspected that Oliver, showing signs of distemper, could have rabies and was euthanized.

32. On or about the start of August 2024, CDPHE became aware of a potential rabies infection in Oliver.

33. A trace-back investigation immediately began at CDPHE.

34. CDPHE, county health departments, and other local officials started communications with as many people connected to the Celebrity Kids as they could identify.

35. Oliver's head was shipped out for necropsy and testing for rabies.

36. A delay in shipping prevented immediate testing and necropsy of Oliver's head.

37. Erin Whitmire continued to care for Pilot, Rocket, and Phineas after an August 3, 2024, adoption event.

38. Through August 7, 2024, communications between CDPHE and local government agencies consistently recognized that many of the Celebrity Kids had been adopted and have owners that were not MAMCO.

39. A positive rabies test for Oliver was confirmed to CDPHE on or about August 6, 2024.

40. Notice of a positive rabies test for Oliver was made available to many adopters, fosters, and other MAMCO team members at a vaccination event on August 7, 2024.

41. Bellatrix was returned to Erin Whitmire's care between August 3 and August 9, 2024, by the individual who had adopted her.

42. CDPHE and local government agencies specifically recognized that many of the dogs were adopted, documented that recognition in emails and internal records, and referred to those people as owners.

43. CDPHE internally referred to the adopters of the Celebrity Kids as owners up through August 7, 2024.

44. CDPHE had information as of August 7, 2024, that several owners that had adopted puppies from MAMCO were voluntarily returning their dogs because of rabies concerns and seeking refunds.

45. CDPHE directed local county governments to find and communicate with owners of these puppies in their jurisdictions and used local governments as the intermediaries for many of their operations related to the rabies investigation.

46. Leading up to August 9, 2024, communications between CDPHE and local governments, owners, and MAMCO all contemplated some type of quarantine procedure with the remaining puppies from the litter.

47. CDPHE was working on a draft public health order at this time, which was shared with local government groups, but this draft has never been shared or released to the public.

48. The Colorado Department of Agriculture administers the Pet Animal Care Facilities Act and is the primary regulator of the rescue MAMCO.

49. The Colorado Department of Agriculture’s Pet Animal Care Facilities Act Division (PACFA) got involved in the CDPHE investigation because regulations on licensed rescues like MAMCO require those rescues to maintain a large number of business records which track adoptions, foster activity, and the movement and care of pet animals owned by rescues.

50. PACFA can identify and access documents held by organizations like MAMCO during the course of its regulatory enforcement actions and investigations.

51. Those documents would aid the CDPHE trace-back investigation.

52. PACFA requested documents from MAMCO to aid CDPHE’s investigation.

53. PACFA had no independent reason to seek records from MAMCO for a violation of PACFA regulations.

54. PACFA has no statutory power to demand records from organizations like MAMCO to aid other governmental investigations.

55. On August 7, 2024, a joint meeting between CDPHE, PACFA, Denver, Jefferson, Arapahoe, and Douglas counties took place to discuss the Celebrity Kids and whether quarantine or euthanasia was appropriate.

56. Defendant Baldwin, the State Veterinarian, found that since there was "a small chance that all puppies could have been exposed [and] without overt signs of bite wounds or reported direct contact with a [Rabies Reservoir Species], the recommendation is to place all littermates into strict 120-day quarantine with administration of PEP vaccines on day 0 (8/7/24), 21, and 60," concluding that euthanasia was not appropriate.

57. Pushback from different parties quickly led government actors to take a mandatory euthanasia posture.

58. CDPHE public health orders may only be issued for purposes of investigating and controlling disease.

59. While circumstances may arise that permit CDPHE to destroy property for purposes of controlling disease in exigent circumstances, it cannot demand any legal person surrender ownership interest in property.

60. Demanding that individuals surrender ownership interest in property to avoid criminal or civil proceedings is beyond the legal powers of CDPHE.

61. If the statute conferred on CDPHE the power to transfer ownership of individuals' property within Colorado to itself, other persons, or organizations for purposes of investigating or controlling disease on threat of criminal prosecution, the law is unconstitutional.

62. On August 8, 2024, Defendant Nick Fisher organized a meeting between himself, three other PACFA employees, Morgan McCarty, Kathryn Romero, and Maggie Baldwin, and Allison Kohnen of CDPHE.

63. Meeting logs show Defendants Nick Fisher, Morgan McCarty, Kathryn Romero, Maggie Baldwin, and Allison Kohnen attended the August 8, 2024, meeting.

64. Upon information and belief, to facilitate the mandatory euthanasia posture that developed around August 7, 2024, CDPHE sought a way to seize the Celebrity Kids for purposes of killing them.

65. Upon information and belief, Defendant Nick Fisher or another PACFA employee, in the August 8, 2024, meeting, proposed a plan to CDPHE to deprive the owners of the Celebrity Kids of their property rights in their dogs and their rights to due process.

66. PACFA, through Defendants Nick Fisher, Morgan McCarty, Kathryn Romero, and Maggie Baldwin, unlawfully gained access to all MAMCO records through a demand to produce business records.

67. Among those records were adoption contracts documenting payment of adoption fees showing these documents to be final paperwork transferring ownership from the Celebrity Kids litter.

68. Also among those records were separate foster agreements between Plaintiffs and MAMCO.

69. Upon information and belief, in the August 8, 2024, Defendant Nick Fisher presented the foster agreements between MAMCO and the adopters.

70. Upon information and belief, Defendant Nick Fisher presented a plan to CDPHE to deprive the adopters of their due process rights in the property by arguing they were not the “real” owners of the puppies in order to seize and kill all of the Celebrity Kids.

71. The plan relied on an implicit or explicit threat of PACFA enforcement action against MAMCO.

72. PACFA regulations prohibit rescues from adopting animals under certain conditions.

73. Rescues operating in Colorado can face regulatory consequences for adopting out animals in violation of PACFA regulations.

74. Adoptions made in violation of PACFA regulations are still lawful adoptions as transfers of legal ownership.

75. PACFA has no power to void or undo adoptions that violate their regulations.

76. PACFA has no power to regulate or seize animals adopted out to individuals in violation of its regulations.

77. PACFA regulates businesses.

78. PACFA cannot regulate or investigate individuals for any violation of any kind if they are not engaged in statutorily defined activity for purposes specifically defined by statute.

79. MAMCO’s adoption contracts for the Celebrity Kids were labeled as “Foster to Adopt” adoption contracts.

80. These contracts were used to navigate a regulatory gray area within PACFA's regulations and prevent MAMCO from violating PACFA's regulations which attach consequences to certain kinds of adoptions by rescues.

81. Defendants knew or should have known the adoptions were final under the Foster to Adopt agreements and that ownership was supported by the adoption agreements they had in their possession.

82. There was no subsequent agreement or paperwork necessary to finalize any adoption under the "Foster to Adopt" Agreements between MAMCO and Plaintiffs.

83. The documents held by Defendants show payments for adoptions by Plaintiffs Eden and the Emerys for dogs from the Celebrity Kids.

84. Upon information and belief, Defendants knew MAMCO would face regulatory consequences if it asserted the adoptions were finalized when signed if in violation of PACFA regulations, because Defendant Nick Fisher stated he would take that enforcement action.

85. MAMCO's Foster to Adopt agreement comes with all the standard paperwork that would be given to any other adopter of a dog and labels the signer of that paperwork as "Adopter."

86. Upon information and belief, Defendant Nick Fisher stated PACFA's regulatory power over MAMCO would prevent it from challenging a public health order issued against MAMCO as the owner of all of the Celebrity Kids.

87. Upon information and belief, Defendant Nick Fisher claimed MAMCO could not challenge a public health order issued against it without jeopardizing its license to operate.

88. Upon information and belief, Defendant Nick Fisher or another PACFA employee informed CDPHE a public health against MAMCO would be difficult to challenge because of PACFA's ability to take regulatory action against MAMCO.

89. Upon information and belief, PACFA Defendants claimed MAMCO should not have adopted those dogs out in violation of PACFA regulations.

90. Upon information and belief, Defendants Nick Fisher, Morgan McCarty, Kathryn Romero, and Maggie Baldwin claimed PACFA could void the ownership transfer to the adopters because it violated PACFA regulations.

91. Upon information and belief, Defendant Nick Fisher or another PACFA employee claimed PACFA and CDPHE could position the adopters against MAMCO.

92. Defendants relied on MAMCO's inability to challenge the lawfulness of a public health order without regulatory consequences as a key component of the plan to deprive all owners of the Celebrity Kids of their rights.

93. Defendants Nick Fisher, Morgan McCarty, Kathryn Romero, Maggie Baldwin, and Allison Kohnen, as evidenced by the final public health order and enforcement action, agreed to falsify information to issue a public health order against MAMCO for dogs they knew or should have known MAMCO no longer owned.

94. Upon information and belief, the purpose of the agreement was to deprive the adopters of their due process rights by falsifying information to support the pending CDPHE public health order to prevent it from being challenged.

95. PACFA benefited from the agreement by turning adopters against MAMCO, who had angered PACFA by circumventing their regulations.

96. Defendant Nick Fisher and PACFA regulators have a history of selective enforcement that prioritizes inspections, investigations, and enforcement actions against regulated entities they perceive to have resisted PACFA agents rather than prioritizing enforcement against entities causing harm to animals in violation of state law.

97. PACFA, under Defendant Nick Fisher's guidance, regularly abuses its investigative powers to aid unrelated state and local investigations by requesting business records under generalized investigations.

98. PACFA, under Defendant Nick Fisher's guidance, prioritizes PACFA enforcement actions against small rescues with foster operations that often request animal forfeitures, demand euthanasia, and cause unnecessary suffering and death of animals.

99. PACFA, under Defendant Nick Fisher's guidance, while prioritizing selective enforcement against rescues, has failed to follow up and investigate serious welfare violations at facilities best described as puppy mills.

100. PACFA, under Defendant Nick Fisher's guidance, looks for ways to expand the regulatory burdens and investigations on small rescues and seeks to end the import of animals from outside of Colorado into Colorado.

101. The agreement to deprive adopters of their due process rights facilitated the organizational objectives of PACFA under Defendant Nick Fisher's guidance by targeting small rescues, the foster system, and out-of-state animal imports.

102. PACFA, under Defendant Nick Fisher's guidance, used the MAMCO seizure to justify a new PACFA rulemaking that implements new regulatory restrictions that apply only to

out of state imports of animals, which placed regulatory burdens almost exclusively on small rescues, the foster system and out of state imports.

103. The agreement to deprive adopters of their due process rights facilitated the organizational objectives of CDPHE during the rabies investigation of actions that could be argued controlled the spread of rabies without implementing mass quarantines.

104. Mass quarantines have significant social and political consequences.

105. After COVID-19 Defendants would have sought to avoid issuing a mass quarantine public health order.

106. A public health order for a mass quarantine related to controlling rabies would have carried greater political consequences for Defendants than depriving a handful of people of their constitutional rights.

107. A public health order directed at family pets would have carried great social and political consequences for Defendants.

108. Defendants had an interest in directing any possible public outrage at MAMCO and away from themselves.

109. CDPHE and its employees knew or should have known that CDPHE could not demand individuals surrender ownership of their property under CDPHE's powers to issue Public Health Orders.

110. Defendant Allison Kohnen knew or should have known that CDPHE could not demand a business surrender ownership of their property under CDPHE's powers to issue Public Health Orders.

111. Upon information and belief, Defendant Allison Kohnen advised Defendants Calonge and Hunsaker Ryan of the August 8, 2024, meeting between Nick Fisher, Morgan McCarty, Kathryn Romero, and Maggie Baldwin, and herself.

112. Prior to the August 8, 2024, meeting, CDPHE and Defendants Calonge and Hunsaker Ryan knew or should have known that Celebrity Kids had been adopted and could not have issued a public health order against MAMCO alone.

113. Defendants Calonge and Hunsaker Ryan could only have signed a public health order against MAMCO if they agreed to the plan developed by Nick Fisher, after being informed by Allison Kohnen.

114. Upon information and belief, Defendants Calonge and Hunsaker Ryan agreed to the plan developed by Nick Fisher, after being informed of the content of the August 8, 2024, meeting by Allison Kohnen.

115. Defendants required local law enforcement to carry out their public health order.

116. Defendants did not directly involve local law enforcement in their plan to falsify the public health order.

117. Defendants intentionally left local law enforcement out of their plan because they knew or should have known PACFA and CDPHE's regulatory expertise would be sufficient facial justification for local enforcement officers executing the seizures on their behalf.

118. Because Defendants did not involve local law enforcement in their plan, Defendants knew or should have known that local law enforcement would become shielded tools to deprive Plaintiffs of their rights under the doctrine of Qualified Immunity.

119. Defendants knew or should have known local law enforcement would deprive Plaintiffs of their rights if those local law enforcement agents could not be held legally accountable.

120. Defendants knew or should have known they could rely on PACFA's "expertise" and access to documents to spread false information to local law enforcement that all Celebrity Kids were actually owned by MAMCO.

121. Defendants knew or should have known PACFA and CDPHE's expertise would be sufficient to overcome previous communications from Defendants to local law enforcement referring to Plaintiffs and other individuals as owners of the Celebrity Kids.

122. Defendants knew or should have known their falsified public health order would provide legal protection for local enforcement executing the Public Health Order on their behalf as facially valid against MAMCO.

123. Evidence of Defendants' agreement is present in many emails between government agencies.

124. For example, at 1:57 PM on August 8, 2024, before CDPHE could relay the false information to Denver Animal Protection, Denver Animal Protection employee Emily Loisel described her interactions with "adopting families of littermates."

125. At 5:44 PM on August 8, 2024, after CDPHE communicated false information to Denver Animal Protection, that same employee, Emily Loisel stated, "Apparently MAMCO still technically owns all 11 puppies. PACFA stated that all the 'adopted' puppies are actually in a foster to adopt agreement still. This could be an avenue to get all dogs centralized to MAMCO and then give an order for euthanasia."

126. That same email highlighted PACFA's antagonistic enforcement priorities against facilities that resist PACFA instead of facilities with animal welfare concerns, which stated "MAMCO is also resisting CDPHE and local county orders though. Seems like PACFA has zero trust in MAMCO."

127. On or about August 9, 2024, CDPHE issued Public Health Order 24-03, directed to MAMCO, concerning a single case of rabies in a puppy, Oliver, from the Celebrity Kids.

128. Because public health orders can only be issued to investigate or control the spread of disease, Defendants knew or should have known the Public Health Order demanding the transfer of ownership was unlawful.

129. The order, which was directed exclusively at MAMCO, did not apply to private adopters and did not authorize enforcement against individuals who had lawfully adopted dogs from MAMCO.

130. Defendants withheld the "Foster to Adopt" agreements from county enforcement agencies.

131. CDPHE, in coordination with PACFA and local animal control agencies from Jefferson and Denver County, used the order to justify a series of coerced seizures targeting private citizens and their property.

132. Acting without judicial warrants, Defendants and local enforcement agents approached Plaintiffs (private adopters who had vaccinated, cared for, and legally owned their dogs) and demanded they surrender ownership of their pets under threat of arrest, prosecution, or home searches.

133. Local law enforcement agents did not demand that dogs be turned over to the control of the state, but that ownership of the dogs must be surrendered and that an ownership surrender form be signed to avoid prosecution.

134. In each case, officials asserted, based on the issued Public Health Order, that the dogs remained in MAMCO's legal custody.

135. Plaintiffs signed away ownership to local animal control operations to avoid criminal prosecutions.

136. The animals were seized without exigent circumstances, were later euthanized despite being asymptomatic, and all tested negative for rabies postmortem.

137. On August 9 and 10, 2024, Jefferson County and CDPHE officials appeared at Jessica Eden's home multiple times, pounded on her door, attempted to provoke the dog to bark, and affixed a court order addressed only to MAMCO to her front door.

138. Officials claimed Musubi was still in MAMCO's legal custody, based on the Public Health Order, and threatened arrest and prosecution if the ownership of the dog was not surrendered to local animal control for euthanasia.

139. No valid court order or warrant had been issued against Eden for Musubi.

140. Under duress and threat of arrest, Eden surrendered ownership of Musubi, who was euthanized at Foothills Animal Shelter despite being asymptomatic and vaccinated. Musubi tested negative for rabies postmortem.

141. Walter and Leslie Emery adopted a dog named Sam on July 27, 2024, and possessed legal documentation of ownership.

142. On August 9, 2024, a Denver Animal Protection officer arrived at their home, claimed Sam remained in MAMCO custody, based on the Public Health Order, and told Walter he would be arrested unless Sam was surrendered within five minutes.

143. Acting under coercion and in fear of criminal consequences, the Emerys complied.

144. Sam was euthanized shortly thereafter despite being healthy, vaccinated, and asymptomatic. Sam too tested negative for rabies postmortem.

145. After Sam's negative rabies test came back, Denver Animal Protection apologized and offered the Emerys a free puppy from their shelter.

146. Erin Whitmire, a MAMCO foster, was told by Denver Animal Protection that she must surrender ownership of four healthy puppies or face prosecution and potential home search.

147. These four puppies had been vaccinated on August 7, 2024.

148. Despite being healthy and vaccinated, all four dogs (Pilot, Rocket, Phineas, and Bellatrix) were euthanized without any judicial process. Each tested negative for rabies postmortem.

149. Each of these animals was destroyed without valid legal authority or process.

150. These actions were unconstitutional seizures of personal property without warrants, probable cause, or valid consent, and deprived Plaintiffs of constitutionally protected property and privacy in their homes without notice or hearing.

151. The Public Health Order upon which Defendants relied was not a judicial warrant, did not confer enforcement authority over private citizens, and lacked particularity and probable cause.

152. This conduct violated the Fourth and Fourteenth Amendments and was compounded by falsification of the public health order's scope.

153. Defendants acted with full awareness of the adoptions and in disregard of their statutory limits.

154. The seizures exceeded the scope of CDPHE and PACFA's lawful investigatory and enforcement powers.

155. CDPHE and its agents violated established health protocols by refusing quarantine options or post-exposure treatment and proceeded with euthanasia without individualized risk assessments.

156. CDPHE cannot issue public health orders requiring that property be surrendered to the control of the state for purposes of destruction in violation of its established health protocols requiring individualized risk assessments.

157. A public health order demanding surrender of control for destruction before the state has control of the property to assess its need for destruction for purposes of controlling disease is unlawful.

158. Each of Plaintiffs' dogs tested negative for rabies postmortem, confirming the absence of any legitimate emergency or exigent circumstances.

159. These actions were not only unconstitutional but ultra vires, tortious, and emotionally devastating to the families involved.

160. Plaintiffs Jessica Eden, Walter and Leslie Emery, and Erin Whitmire, currently own other pets, making it reasonably likely the State could repeat the same conduct.

161. Plaintiff Jessica Eden owns another puppy that is about two years old. She adopted him from MAMCO Rescue in November shortly before PACFA shut MAMCO down.

162. Plaintiffs Leslie and Walter Emery own several animals: a one-year-old dog, a four-year-old dog, an eleven-year-old cat, and a twelve-year-old cat.

163. Leslie and Walter Emery adopted another dog in September 2024 but soon after returned it to MAMCO because of the emotional distress caused by the prior seizure and euthanasia of Sam.

164. Plaintiff Erin Whitmire has a dog that is about 10 years old whom she adopted after fostering him.

165. Defendants' conduct violated Plaintiffs' clearly established constitutional rights.

## COMPLIANCE WITH COLORADO GOVERNMENTAL IMMUNITY ACT

166. Plaintiffs have complied with the notice requirements of the Colorado Governmental Immunity Act ("CGIA"), C.R.S. § 24-10–109. Plaintiffs timely filed written notice of their claims with the appropriate public entities within 182 days after discovery of the injuries alleged in this Complaint. As such, Plaintiffs' state tort claims are not barred by governmental immunity.

## CAUSES OF ACTION

### CLAIM I – 42 U.S.C. § 1983: Unreasonable Seizure in Violation of the Fourth Amendment

*(Against Defendants Hunsaker Ryan, Calonge, Kohnen, McCarty, Baldwin, Fisher, and Romero, in their individual capacities; against the same Defendants in their official capacities solely for prospective injunctive relief)*

167. Plaintiffs incorporate all preceding paragraphs.

168. Defendants, acting under color of state law, coerced the surrender of Plaintiffs' dogs and caused them to be destroyed without a warrant, individualized probable cause, or valid consent, and outside any recognized exception to the warrant requirement.

169. These actions constituted a seizure of Plaintiffs' personal property within the meaning of the Fourth Amendment.

170. The administrative Public Health Order relied on by Defendants was not a valid warrant: it was issued by CDPHE, contained intentionally false and fabricated material specifically designed to deprive Plaintiffs of their property, was not issued by a neutral and detached magistrate, lacked particularity as to Plaintiffs, and was not supported by individualized probable cause.

171. Defendants directed local law enforcement to issue threats of arrest on their behalf to obtain purported "consent" to the seizures; that consent was not voluntary.

172. Each of Plaintiffs' seized animals was ultimately euthanized and later tested negative for rabies, demonstrating that the seizures lacked both necessity and legal justification.

173. On August 9 and 10, 2024, Jefferson County officials repeatedly visited Eden's home, pounded on the door, attempted to provoke the dog to bark, and taped a court order addressed only to MAMCO to her front door.

174. Officials falsely stated that Eden's dog, Musubi, remained in MAMCO's custody and threatened Eden with arrest if she did not surrender him.

175. Officials further threatened to withhold post-exposure treatment for household members and for Musubi unless he was relinquished.

176. Eden surrendered Musubi under duress, fearing arrest and prosecution. No judicial warrant was issued.

177. Musubi was euthanized despite being asymptomatic; postmortem testing confirmed he was negative for rabies.

178. Erin Whitmire fostered four puppies from the litter and, on August 7, 2024, vaccinated them for rabies and other diseases.

179. Shortly after, Denver Animal Protection officials instructed her to surrender the animals or face prosecution.

180. Whitmire had no independent legal obligation to surrender the animals to CDPHE's or PACFA's control for destruction, and no warrant or judicial order was ever presented to her.

181. Whitmire surrendered all four animals under threat of arrest and forced home entry.

182. All four dogs were euthanized and later tested negative for rabies.

183. When Leslie Emery first spoke with state officials, she was told to choose between quarantining Sam, returning him to MAMCO, or surrendering him for euthanasia.

184. The following day, a Denver Animal Protection officer told the Emerys they were out of compliance with a relinquishment deadline and at risk of criminal charges.

185. The officer warned that Walter Emery would be arrested if Sam was not surrendered within five minutes.

186. Sam was euthanized without symptoms and later tested negative for rabies.

187. Each seizure described above was effectuated under color of law pursuant to the falsified Public Health Order and was warrantless, coercive, and unsupported by exigent circumstances.

188. Defendants' conduct violated clearly established Fourth Amendment rights, and no reasonable official could have believed that coercing the surrender of animals known to be lawfully owned, under a Public Health Order that did not by its terms apply to the owners, was lawful.

**CLAIM II – 42 U.S.C. § 1983: Deprivation of Property Without Due Process, in Violation of the Fourteenth Amendment**

*(Against Defendants Hunsaker Ryan, Calonge, Kohnen, McCarty, Baldwin, Fisher, and Romero, in their individual capacities; against the same Defendants in their official capacities solely for prospective injunctive relief)*

189. Plaintiffs incorporate all preceding paragraphs.

190. The Fourteenth Amendment prohibits the government from depriving individuals of property without due process of law. U.S. Const. amend. XIV.

191. Plaintiffs had a protected property interest in their companion animals, which are personal property under Colorado law.

192. Plaintiff Erin Whitmire had a protected custodial interest in the animals in her care as a licensed foster.

193. Defendants failed to provide any meaningful notice or opportunity to be heard before the permanent deprivation of Plaintiffs' property.

194. No judicial proceedings, hearings, or individualized risk assessments were provided, despite the availability of time and procedural alternatives.

195. The State Veterinarian, Defendant Baldwin, had recommended a 120-day quarantine with post-exposure vaccination rather than euthanasia; that recommendation was overridden without any individualized process as to Plaintiffs' specific animals.

196. Every Colorado county subject to this suit maintains procedures for animal impoundments, including for dogs accused of dangerous behavior, that provide for a hearing before a judge before an animal may be destroyed, absent exigent circumstances.

197. No such procedure was afforded to Eden, the Emerys, or Whitmire, despite the availability of time and those alternative procedures.

198. Defendants had no exigent justification to bypass due process: each animal was asymptomatic, and each later tested negative for rabies.

199. The failure to provide any process before the destruction of Plaintiffs' property, or property in Whitmire's lawful custody, violated clearly established due process principles and caused irreparable harm.

200. Defendants are liable under 42 U.S.C. § 1983 for depriving Plaintiffs of property without due process of law.

**CLAIM III – Ultra Vires Agency Action / Declaratory and Injunctive Relief**

*(Against CDPHE, PACFA, and Defendants Hunsaker Ryan, Calonge, Kohnen, McCarty, Baldwin, Fisher, and Romero, in their official capacities)*

201. Plaintiffs incorporate all preceding paragraphs.

202. CDPHE and PACFA are authorized to act only within the scope of authority delegated by statute.

203. The Public Health Order issued on August 9, 2024, was directed only at MAMCO Rescue.

204. Public health orders issued by CDPHE may not demand the surrender of ownership interests in property on threat of criminal prosecution; such orders may be issued only for purposes of investigating and controlling disease.

205. While CDPHE may, in appropriate circumstances, destroy property to control disease, demanding surrender of ownership in property exceeds CDPHE's statutory powers.

206. To the extent any statute is construed to confer on CDPHE the power to transfer private property to itself or to third parties on threat of criminal prosecution, that construction is unconstitutional.

207. The falsified Public Health Order did not confer authority to seize or destroy animals already adopted into private homes.

208. The Order was signed by an administrative officer and lacked the authority of a judicial seizure order.

209. Defendants misrepresented the legal status of adopted animals as "fosters" in order to justify enforcement beyond the Order's stated scope.

210. Defendants leveraged threats of regulatory retaliation against MAMCO to insulate their conduct from challenge.

211. Adoption agreements and purchase records were on file with MAMCO and known to Defendants; despite this, Defendants acted as though the dogs remained subject to PACFA regulation and MAMCO custody.

212. CDPHE and PACFA relied on powers conferred under C.R.S. § 25-1.5-102 and C.R.S. § 35-80-108, but neither statute authorizes warrantless seizure or destruction of privately owned animals based solely on an administrative reclassification of ownership.

213. PACFA, under Defendant Nick Fisher, has a practice of using its broad investigatory authority over regulated facilities to gather records for use in collateral civil and criminal proceedings rather than for regulatory compliance purposes — conduct that is itself ultra vires.

214. In this case, that practice was used to falsify ownership information and convey it to county agencies in furtherance of the unlawful Public Health Order.

215. By acting outside the scope of their statutory authority, Defendants violated Colorado law, and their actions are void as ultra vires.

216. Plaintiffs seek a declaration that Public Health Order 24-03 did not authorize seizure of animals from private owners, and an injunction preventing Defendants from applying public health orders to compel surrender of ownership in property, or from using PACFA's investigatory authority for purposes unrelated to facility regulation, in the future.

**CLAIM IV – Civil Conspiracy (Colorado Common Law)**

*(Against Defendants CDPHE, Kohnen, PACFA, McCarty, Baldwin, Fisher, and Romero)*

217. Plaintiffs incorporate all preceding paragraphs.

218. Defendants Fisher, McCarty, Romero, Baldwin, and Kohnen agreed, by words and conduct, to falsify the scope and factual basis of the Public Health Order in order to seize and euthanize dogs they knew had been lawfully adopted, and to do so without legal authority to compel surrender of privately owned property.

219. Defendant Nick Fisher, as PACFA Section Chief, had access to MAMCO's adoption records and knew that legal ownership of the dogs had been transferred to individual adopters.

220. Despite that knowledge, Defendants agreed to represent to county enforcement agencies that the animals remained in MAMCO's custody, in order to use PACFA's regulatory leverage over MAMCO as cover for the seizures.

221. Defendants agreed to leverage regulatory retaliation against MAMCO to prevent them from challenging the unlawful Public Health Order.

222. Defendants committed overt acts in furtherance of the agreement, including but not limited to: presenting a plan to CDPHE on August 8, 2024, to characterize adopters as non-owners; withholding the "Foster to Adopt" agreements from county agencies; drafting and issuing the unlawful and falsified Public Health Order; and communicating the false MAMCO-ownership position to Denver Animal Protection, as reflected in the 5:44 PM, August 8, 2024 email from Denver Animal Protection employee Emily Loisel describing PACFA's representation that the puppies could be “centralized to MAMCO” for a euthanasia order.

223. These overt acts directly caused the seizure and destruction of Plaintiffs' property and the harms alleged throughout this Complaint.

224. Defendants are liable for civil conspiracy under Colorado law.

**CLAIM V – Conversion**

*(Against Defendants CDPHE, Hunsaker Ryan, Calonge, Kohnen, PACFA, McCarty, Baldwin, Fisher, and Romero)*

225. Plaintiffs incorporate all preceding paragraphs.

226. Plaintiffs Eden and the Emerys held documented legal ownership of Musubi and Sam, respectively; Plaintiff Whitmire held lawful custodial rights in Pilot, Rocket, Phineas, and Bellatrix.

227. Defendants exercised dominion and control over each animal — by directing its surrender, taking possession of it, and causing it to be euthanized — without Plaintiffs' voluntary consent and without any lawful process authorizing that control.

228. That exercise of control was inconsistent with, and in total derogation of, Plaintiffs' ownership and custodial rights, and resulted in the complete and irreversible loss of the property through euthanasia.

229. Plaintiffs were damaged in an amount to be proven at trial, including the value of the animals and associated losses.

230. Defendants are liable for conversion under Colorado law.

**CLAIM VI – Intentional Infliction of Emotional Distress (Extreme and Outrageous Conduct)**

*(Against Defendants CDPHE, Hunsaker Ryan, Calonge, Kohnen, PACFA, McCarty, Baldwin, Fisher, and Romero)*

231. Plaintiffs incorporate all preceding paragraphs.

232. Defendants' conduct; falsifying the basis for a Public Health Order, and directing officials to threaten private citizens with arrest, prosecution, and home searches over healthy, lawfully owned, vaccinated pets; under ultimatums as short as five minutes, went beyond the bounds of decency tolerated in a civilized community.

233. Defendants knew or recklessly disregarded that this conduct would cause the owners severe emotional distress, particularly given that the animals were ordered surrendered directly to euthanasia.

234. Plaintiffs did in fact suffer severe emotional distress as a result, including the trauma of surrendering healthy animals under threat of arrest and learning afterward that each animal tested negative for rabies and had been destroyed unnecessarily.

235. Denver Animal Protection's post-hoc apology and offer of a replacement puppy to the Emerys is relevant evidence of Defendants' wrongful conduct.

236. Defendants are liable for intentional infliction of emotional distress under Colorado law.

**CLAIM VII – RESPONDEAT SUPERIOR / VICARIOUS LIABILITY**

*(Against Defendants CDPHE and PACFA. This claim applies solely to Plaintiffs' Colorado common-law tort claims.)*

237. Plaintiffs incorporate all preceding paragraphs.

238. At all times relevant to this Complaint, Defendants Hunsaker Ryan, Calonge, Kohnen were employees, agents, and/or servants of Defendant CDPHE, and were acting within the course and scope of that employment, agency, and/or service.

239. At all times relevant to this Complaint, Defendants McCarty, Baldwin, Fisher, and Romero were employees, agents, and/or servants of Defendant PACFA, and were acting within the course and scope of that employment, agency, and/or service.

240. The acts and omissions of Defendants Hunsaker Ryan, Calonge, Kohnen, McCarty, Baldwin, Fisher, and Romero alleged herein were performing duties assigned to them by the Defendant agencies, in furtherance of the agencies' business, and within the time and space limits of their employment.

241. Under the doctrine of respondeat superior, an employer is liable for the tortious acts of its employees committed within the scope of their employment. Because Defendants Hunsaker Ryan, Calonge, Kohnen, McCarty, Baldwin, Fisher, and Romero's conduct occurred within the scope of their employment with the agencies, the agencies are vicariously liable for the injuries and damages proximately caused by that conduct, to the same extent as if the agencies had committed the acts themselves.

242. As a direct and proximate result of the conduct described above, Plaintiffs suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A. Declare the Public Health Order 24-03 unlawful and did not authorize forfeiture from private pet owners;

B. Declare CDPHE's actions unlawful and ultra vires;

C. Declare PACFA's actions unlawful and ultra vires;

D. Declare that Plaintiffs Eden and Walter and Leslie Emery were the lawful owners of Musubi and Sam, respectively;

E. Enjoin Defendants from issuing unlawful public health orders;

F. Enjoin Defendants from abusing PACFA's regulatory powers;

G. Award Plaintiffs compensatory damages against the individual Defendants, in their individual capacities, on Claims I, II, IV, V, VI, and VII;

H. Award Plaintiffs punitive damages against the individual Defendants, in their individual capacities, to the extent permitted by law, on Claims I, II, IV, V, VI, and VII;

I. Award Plaintiffs attorneys' fees and costs under 42 U.S.C. § 1988 as to Claims I and II;

J. Grant such other relief as the Court deems just and proper.

Respectfully submitted this 3rd day of August, 2026.

*/s/Jeremy McKay*
Jeremy McKay
Alexa McKay
Environmental and Animal Defense
501 S Cherry St., Suite 1100
Denver, CO 80246
Telephone: 720-722-0336
jmckay@eadefense.org
amckay@eadefense.org
*Attorneys for Plaintiffs*